# UNITED STATES COURT OF APPEALS

## FOR THE FIRST CIRCUIT

———————

| | |
|---|---|
| No 23-8019 | RESPONSE |
| May 1, 2023 | IN RE: JAMES HAYES |
| | Respondent, |

———————

## SHOW CAUSE RESPONSE OF RESPONDENT

Pursuant to Rules of Attorney Disciplinary Enforcement for the Court of Appeals for the First Circuit, Rule II (C) (2)

[There was such an infirmity of proof establishing the misconduct as to give rise to the clear conviction that this Court could not, consistent with its duty, accept as final the conclusion on that subject]

The Respondent, prior to disbarment, was a member of the bar in good standing in the Commonwealth of Massachusetts for forty years and never disciplined nor party to any prior disciplinary proceeding. The underlying complaint was made by a single client – one of thousands of otherwise uneventful and successful client engagements.

This response asserts just cause for declining to disbar the respondent from practice before this Honorable Court. The reasons include a woefully abusive credibility determination in favor of the Complainant that violated the Respondent's substantive and procedural constitutional rights to due process of law. The stilted actions of the Hearing Committee include invention and implementation of a procedure that permitted Bar Counsel to substitute its own testimony for that of the Complainant when the Complainant perjured himself during testimony before the Hearing Committee. This measure sought to cloak with credibility Complainant's otherwise unbelievable and perjured testimony.

1

## The Disbarment

The respondent was disbarred based on an adverse credibility determination against the Respondent and a favorable credibility determination in favor of the Complainant. Relevant rules make the Hearing Committee's credibility determinations nearly irreversible. The respondent asserts that the rule cannot authorize a favorable credibility determination that wrongly obliterates otherwise credible evidence presented by the Respondent before the Hearing Committee.

## THE ALLEGED WRONGDOING "proven" THROUGH HEARING COMMITTEE'S MISCONDUCT

I – Basis for hearing committee's disbarment recommendation. The Hearing Committee and the Board found that the Respondent charged fees in secret when he carried out nearly four years of representation of a single client. The representation occurred before four different federal and state courts and five different state and federal government agencies. The Hearing Committee and the Board found that all of the approximately $75,000.00 (net of approximately $11,000.00 of expense disbursements) fees collected for the nearly four years of multiple successful representations were excessive. They were deemed excessive because the Complainant testified he did not know he was being charged the fees, and that he still (as of the hearing date) did not know what fees were charged for what work because they were collected in secret and therefore the amounts were excessive in relation to the work performed.

II - <u>The fees could not have been set and charged in secret but the Hearing Committee found otherwise after inventing an unconstitutional procedure that facilitated perjury by permitting Bar Counsel to replace her testimony for the accuser's perjured testimony.</u>

A - <u>Exhibit</u> 56 – the first of two bar complaints the single complainant filed against the

respondent (August 2014, then June 2017)

1. On day one of the Hearing the Complainant testified at length on each and every fee that

   was charged. He acknowledged having requested much of the representation. However,

   other than one $15,000 fee, one $7,000.00 fee and another $1,000.00 fee he denied

   under oath knowing that the remaining fees were charged and what work the charges

   related to.

2. On cross Respondent's counsel introduced Exhibit 56 (attached as Exhibit A) and asked the

   Respondent to explain how all of the fee items complained of could have made their way

   into his 2014 complaint if he still did not know today what he was charged and for what

   work.

3. <u>The perjury:</u> The respondent acknowledged the fee entries on his complaint and admitted

   that the complaint bore his signature. However, he denied that he was the source for the

   fee information the complaint contained. "I did not draft that."     Asked if he did not

   author the complaint who did; the Complainant replied "James Hayes" (the Respondent.)

   Stunned, Complainant's attorney asked: "James drafted the bar complaint against himself,

   is that what you're testifying to?" The complainant then responded" "Yes, yes." (See

   transcript attached as Exhibit B, Day 1, pages 140 to 144)

B. The Hearing Committee's invention: Cross was scheduled to continue the following day. As

The hearing convened the Hearing Committee's Chair interrupted cross and announced the

following: "We did have an off the record discussion regarding whether bar counsel can

speak in between – after cross-examination, have a breakout session with the sitting

witness, and there was a consent to that as long as we reflect it on the record. And now we

have a . . . " ( See day 2 transcript, pages 3-5, attached as Exhibit C.)


1 - After cross concluded the chair turned to Bar Counsel and instructed "All right. Ms.

Lavigne, you needed a few moments in a breakout session, with the parameters we

discussed? Ms. Lavigne responded: "Yes, please." The chair continued "All right. Try to

keep it to five minutes, if we can. . ." Ms. Lavigne: "Will do."


2 - Back on the record, the Chair announced "May the record reflect that there was a

Breakout session between bar counsel, Heather Lavigne; the investigator, Kelly Hannon;

*and the witness, Randal Lamarche"* (emphasis supplied.) "We now come back about six

minutes later, and it's in line with their earlier discussion as to conversations between

counsel – *bar counsel and the witness"* (emphasis supplied.) "And Bar Counsel, you may

proceed with any re-direct."


3 - Then, the witness, in response to the instructions he received in the "breakout" gave

testimony that changed all of his original answers on cross concerning authorship of the

4

2014 bar complaint (see attached transcript from day 2 Vol II, page 26, Exhibit D) This is

where fairness and credibility went off the rails. These actions, and others demonstrate

that the Hearing Committee had a pre-conceived agenda to make a favorable credibility

determination on behalf of the complainant no matter what and how impossibly false

his statements under oath.


III - The illegitimate "breakout" procedure eliminated the respondent's ability to present

meaningful evidence. The Hearing Committee's tortured credibility finding in favor of

Complainant made the inverse finding inevitable: that respondent's testimony and

evidence were credibility-wise not credible and dead on arrival. Among the exculpatory

evidence positively ignored as not credible were approximately 5,000 pages of attorney

work product documenting his successful and extensive representation. (Asked to

provide a copy to respondent, Bar Counsel recently replied that the material was too

extensive to duplicate in full – Exhibit F. Who could blame her?) Although the Board and

the SJC should have evaluated the fees under their own Mass.R.Prof.Conduct 1.5(a) and

Matter of Fordham, 423 Mass 481, 618 N.E. 2d 816 (1996) the fees were evaluated as

though no legal work whatever had occurred. This fiction is irrational and violates

fundamental due process of law. The special breakout procedure employed violated

standards of fairness and due process by denying the respondent the ability to present

evidence *that the Complainant's testimony was not credible*. The breakout procedure

facilitated replacement of the Complainant's perjury on cross with statements of bar

counsel transmitted to the Complainant in the break-out session. *Respondent never*

*made an informed consent.* But for the "break-out" the Complainant's perjury alleging that respondent wrote the bar complaint against himself would have stood unrebutted, making a credibility determination in complainant's favor an impossibility. This result would then have supported a credibility determination in favor of the respondent making the outcome in this matter entirely different (and disbarment impossible.)

## A majority of the Full Board Acquiesces

On June 13, 2022 following a brief hearing, the full Board issued its Memorandum of Decision. It set out a majority opinion and a two member concurrence. The majority opinion adopted the Hearing Committee's Report. Two Board members wrote a different opinion concurring in result (disbarment) but essentially holding that the fees charged could not be theft for two reasons:

1. The fees were for valuable work that the respondent did perform and therefore there was no deprivation.

2. The fees were not charged in secret so their collection was not theft contrary to the majority's finding that applied the holding in <u>Matter of Schoepfer, 426 Mass. 183, 187, 687 N.E. 2d 391 (1997.)</u> (see Board Memo, pages 32-34 and footnote 19, Exhibit E, attached)

## Supreme Judicial Court Acquiesces

On December 2, 2022 the Hon. Justice Serge Georges, Jr. heard oral argument on the Information filed based on the Full Board Memorandum. In opening, Justice Georges initially offered to remand the case, noting factual discrepancies. Bar Counsel

protested (via melancholy sigh) and Justice Georges wrote an opinion that mirrored the Board's Memorandum.

Had there been no break-out misconduct during the initial hearing the evidentiary dominos would have fallen in the opposite direction. Lamarche, having laid out the fees and the services they related to in his 2014 complaint, could then not escape his perjured testimony (i.e. that Respondent, not he' wrote the 2014 complaint against himself.) But for the substitution of that perjury with testimony of Bar Counsel transmitted to Complainant in the break-out, his perjury would have remained unrebutted and his credibility unsustained. The majority's finding that the fees were charged in secret could not then prevail. Schoepfer would have no applicability and the Board minority's "no theft because no deprivation" finding likely would have become the majority opinion. Further, disbarment would not have occurred if the Complainant received the unfavorable credibility determination owing any witness making perjured testimony.

Addendum Explaining the Incontestable Force of the Hearing Committee's Credibility Finding

Relevant SJC Rules and the disciplinary decisions thereunder make virtually incontestable the Hearing Committee's credibility findings. See Matter of Saab, 406 Mass 315, 328, 547 N.E. 2d 919 (1989) : "...the hearing committee is the sole judge of the credibility of the testimony presented at trial." Given their overwhelming authority to assess credibility, one might expect its careful and judicious exercise by the committee. The opposite occurred in this case.

Foregoing discussion of the break-out misconduct illustrates how the Hearing Committee, through overt misconduct, weaponized their power to make incontestable credibility determinations to short circuit otherwise credible exculpatory evidence elicited by the Respondent and his counsel.

But the suspect credibility determinations went beyond the overt "break-out" maneuver. Following are a smattering of false Complainant statements made in his complaints or under the pains and penalties of perjury during his testimony. The Hearing Committee overlooked them all in reaching its "favorable" credibility determination of the Complainant-perjurer.

1. In his bar complaints the Complainant claimed that he received no communication with the Respondent. Respondent's counsel confronted him with Exhibit 66, Verizon telephone records showing dozens of calls between Complainant and Respondent in a five-month period.

2. On hearing Day 1, pages 159-160 Complainant testified that he had no idea of the balances in certain Trust accounts. Complainant's counsel confronted him with Complainant-signed statements acknowledging periodic balances in those accounts throughout representation.

3. On day 2, page 24 Complainant testified that he was never provided the files he requested. Counsel for Respondent introduced Exhibit P - a signed receipt for a CD containing his files and clearly labelled as such. Complainant acknowledged signing the

receipt but insisted he "didn't remember" receiving the CD. The overwhelming force of the Committee's blind credibility determination is illustrated by Justice Georges' relevant findings: "The Board did not disturb this or any other credibility determination and neither will I" (SJC Memo of Decision, page 5.) Justice Georges continued: "Contrary to the Board's memorandum, however. . . any finding that LaMarche, at Hayes' instruction, signed his name on blank paper is not supported by substantial evidence in the record. *Nevertheless, the Committee was entitled to credit Lamarche's testimony that, despite his signature on the receipt, he did not in fact receive the disk.*" (emphasis supplied) Id at page 13, footnote 5.

4. On day 2, page 17 Complainant was asked if he believed in 2014 and 2017 that he had been overcharged why did his 2018 bankruptcy show no claim against respondent as an asset. Respondent offered no explanation.

5. The list goes on. Respondent will not, at this stage, punish the reader with every self-defeating misrepresentation that will later, with this Court's indulgence, be briefed.

## Taking of Property Without Due Process of Law

Perhaps the most egregious impact of the tortured credibility finding in favor of the Complainant and adverse to the Respondent consists in the stripping of every scintilla of value related to Respondent's toil on behalf of the Complainant over nearly four years in four courts and five government agencies. The results included tax recoveries of nearly $100,000.00; favorable settlement of child support claims that saved another $100,000.00 to $150,000.00

below Plaintiff's best and final demand. The record demonstrates only wins and no losses among a dozen or so matters in every endeavor – all while keeping a mercurial (a dozen or so arrests) and unpredictable client free from any incarceration. The Board found that every cent of the +/-$75,000.00 in legal fees and +/- $11,000.00 in disbursements to be excessive, theft and "fraud" - and thereby consigned the Respondent to the status of slave in the name of ethics. The Supreme Judicial Court acquiesced.

A hearing on this matter is respectfully requested.


Respectfully submitted,


James Hayes, Respondent pro se
26 Donna Road
Chelmsford, MA 01824-4706
(978) 250-8962
(617) 943-1254
james.ace@comcast.net

# UNITED STATES COURT OF APPEALS

## FOR THE FIRST CIRCUIT

_____

No 23-8019                                                          RESPONSE

IN RE: JAMES HAYES

Respondent,

_____

## CERTIFICATE OF SERVICE

The undersigned James Hayes, Respondent pro se in the above captioned matter hereby

certifies that on May 1, 2023 I mailed first class, postage prepaid, a complete copy of the

foregoing _Response_ with all Exhibits and attachments with this certificate of service to the

following non-ECF parties identified on the attached service list in this matter:

>Massachusetts Supreme Judicial Court
>MA Supreme Judicial Court
>1 Pemberton Square
>Ste 1300
>Boston, MA 02108-1707
>(certified mail no. 7015 0640 0001 6624 1517 RRR)

>Edward R. Wiest
>81 Dana Street
>Cambridge, MA 02138
>(certified mail no. 7015 0640 0001 6624 1524 RRR)

_James Hayes_

James Hayes, Respondent pro se                    5/1/2023
26 Donna Road                                          Date
Chelmsford, MA 01824-4706
(978) 250-8962
(617) 943-1254
james.ace@comcast.net

11

**Return to Service List Page**

**Service List for Case:** 23-8019 In Re: Hayes

**Current Associated Cases:** none

| Contact Info | Case Number/s | Service Preference | ECF Filing Status |
|---|---|---|---|
| James Hayes<br>Unit 1<br>82 Otis St<br>Cambridge, MA 02141-1719<br>Email: james.ace@comcast.net | 23-8019 | Email | Active |
| James Hayes<br>Apt 1<br>26 Donna Rd<br>Chelmsford, MA 01824<br>Email: james.ace@comcast.net | 23-8019 | Email | Active |
| Massachusetts Supreme Judicial Court<br>MA Supreme Judicial Court<br>1 Pemberton Sq<br>Ste 1300<br>Boston, MA 02108-1707 | 23-8019 | US Mail | |
| Edward R. Wiest<br>81 Dana St<br>Cambridge, MA 02138 | 23-8019 | US Mail | |

12

EXHIBIT A

FORM BBO-1
Page One

EXHIBIT
56



DEFENDANT'S
EXHIBIT
A

# OFFICE OF THE BAR COUNSEL
## OF THE
## BOARD OF BAR OVERSEERS
## OF THE SUPREME JUDICIAL COURT
## FOR THE
## COMMONWEALTH OF MASSACHUSETTS

### REQUEST FOR INVESTIGATION

Date 8/26/2014

(1)  Please type, if possible. Otherwise use a dark pen.

(2)  Write only on the front side of the paper.

(3)  Specify exactly what the attorney did that you believe to have been misconduct.

(4)  Attach additional sheets, if necessary, as well as copies of any documents which will help explain the facts. Please do not send original documents.

(5)  Retain copies for your records of this and any subsequent correspondence and documentation sent to this office.

(6)  Please return to:

**OFFICE OF THE BAR COUNSEL**
99 High Street
Boston, Massachusetts 02110
(617) 728-8750
http://www.state.ma.us/obcbbo/

1.  I, Randal Joseph Lamarche JR
    (type or print your full name)

    allege that attorney James Hayes

    whose office address is 82 Otis Street, Unit One Cambridge, Ma 02141

    has committed acts of misconduct as set forth in the Statement of Facts attached.

2.  I request that the Office of the Bar Counsel investigate this misconduct.

3.  I understand that a copy of this statement may be mailed to the attorney for a reply.

4.  I understand that this matter must be kept confidential by Bar Counsel and the Board of Bar Overseers.

(signature) Randal J Lamarche Jr

(address) 12 Village Lane #51

Tyngsboro mass

(telephone):  Work _____

Cell
Home 978-512-1195

RECEIVED
SEP 3 2014
OFFICE OF
BAR COUNSEL

14

PLEASE USE ATTACHED SHEET FOR STATEMENT

JH X000001

Statement of Facts:

I hired Attorney James Hayes in August of 2013 to represent me in a probate court case, at which time he also advised me to have him draw up a trust account and that he would be the trustee and myself and my brother would be benificiaries.
The amount in the trust account was $170,000.
The verbal agreement   was to pay him $7,500 cash up front and then he took an additional $7,500 out of the trust to handle the probate case. I never received a fee agreement for the probate case. I am not sure of the work that was done and how the $15,000 was broken down. I am not sure what he charged me for the trust account because I never receeived a fee agreement and he just withdrew the funds from the trust account. He never officially filed and appearance for the probate case. He was the only person who was able to make withdrawals from the trust account.
During the next year he continued to advise me.   He would call me at times and tell me that something came up and additional fees for services would be accrued and he would withdraw the funds from the trust account.
I never received anything in writing except for the very last case he was to handle.
I verbally understood that he charged for the following in addition to the above:

* $5,000 from the trust to file my taxes(IRS still does not have)- no invoice received-or fee agreement
* $5,000 from the trust to file my brothers taxes(Were never done at all)no invoice received-or fee agreement
* $3,500 from the trust for a restraining order case that never received a court date- I do not know what work was done on the case and never received any money back.
* $1,000 from the trust to incorporate a business, Crazy Jays-no invoice received-or fee agreement
* $650 from the trust to register a truck in Nh.
* $5,000 from the trust for a sinmple ch 13 bankruptcy that was dismissed-no invoice received-or fee agreement
* $4,700 from the trust for a lawsuit in a lemon law case that never went forward- I never received funds back,   a fee agreement or breakdown of work done
* $4,300 from the trust for attorney to represent me in the probate case that I already paid Attorney Hayes for but for some reason he hired him without my knowlage. i never received any fee agreement.
* $5,000 from the trust for a probate modification that never went to trial, I never received a breakdown of the work done, fee agreement or refund of funds not used.
* $500 from the trust for paperwork on a vehicle
* $50,000 came out of the trust account to pay for the agreement in the probate case.
* We did receive 2 checks for personal uses from the trust account, one for $8,000 and one for $12,000.
* Most recently paid from the trust an additional $5,800 for HIPPA case he is representing me for and an additional $1,200 for him to use his computer specialist for computer research.
* $3,000 from the trust for receipts- I have not received the break down of the receipts.
* $1,600 from the trust account to pay my personal insurance policy.

15

JH X000002

This totals $123,750 from the trust account. I am concerned that the remainder of the funds are not accounted for. Approximately $46,250 which should be in the trust account but my attorney advised me that there are no more funds in the account.

I feel that the Attorney has committed acts of misconduct in the following ways:
* Charged excessive fees
* Mismanagement of the trust account (Mystical Motors)
* Lack of communication
* Lack of providing me fee agreements, fee breakdowns and refunding me funds not used.

I am disabled and I hired Attorney Hayes because I did not know how to represent myself legally. I trusted that he was going to work in my best interest but I am very concerned of how things have turned out.
He was in charge of $170,000 and I am concerned that he is not able to provide me with statements or breakdowns if where the money was spent.
I have asked him repeatedly for fee agreements and bank statements and he has not provided me with anything I have requested. I have become very stressed out and depressed due to this   and I would like some assistance and assurance that I was represented fairly. I feel like I may have been taken advantage of.

Please see attached documents and email conversations, these are all I have received.
Sincerely,

Randal J. Lamarche Jr.

16

EXHIBIT B

17

1    can't see Mr. Wiest?

2              MR. CARAKATSANE:  I can see him.

3              MR. WOOLF:  I cannot.  Let me try

4    pinning him and see what happens.

5    Q.   If we go back to Exhibit 10 --

6              MR. WOOLF:  I don't see him with

7    my pin.

8              MS. YU:  Nor do I.

9              MR. WIEST:  Okay, let me just

10   check.  I think I may -- I think I know,

11   okay, I know what happened.  Am I back?

12             MS. YU:  Hold on.

13             MR. WIEST:  Okay.  I can't be

14   seen?  Let me just try...

15             MS. YU:  You cannot.

16             MS LaVIGNE:  I can't see him.

17             MR. YU:  Could you switch your web

18   cam on?

19             (Discussion held off the record.)

20             MS. YU:  And let me take us off

21   the live stream while we...

22             (Discussion held off the record.)

23             MS. YU:  We are back live

1    streaming.

2           MR. CARAKATSANE:  We can go back

3    on the record.  Go ahead, Mr. Wiest.

4    **Q.**   If we could take a look at Exhibit 10,

5    which was the fee agreement, if you go to

6    the numbered paragraphs on the first page

7    of BC021, do you see those fees?

8    **A.**   Yeah, I know that fee.  I know that

9    fee, the $15,000.

10   **Q.**   Well, there's a, there's a mention of

11   a fee of $4500 for nonjudicial matters,

12   paragraph 1?

13   **A.**   I didn't see that one.

14   **Q.**   Well --

15   **A.**   Okay, I can see it now.

16   **Q.**   Did you read this before you signed

17   it?

18   **A.**   No.

19   **Q.**   Mr. Hayes, did Mr. Hayes basically

20   insist you sign it without reading it?

21   **A.**   He didn't go over it with me, no.

22          MR. WIEST:  Mr. Woolf, could we

23   open up what I sent up as impeachment A,

1    which I will represent to Bar Counsel is

2    the original complaint of 2014

3    Mr. Lamarche submitted to Bar Counsel.

4           MR. WOOLF:  All right.  Give me a

5    second.  I have to retrieve it and then

6    put it up on the screen and then share it.

7    Q.  All right.  Mr. Lamarche, I'm showing

8    you a document marked A, which I will

9    represent is the document that you

10   submitted to Bar Counsel in August 2014 as

11   an initial complaint?

12   A.  Right.

13   Q.  That is your sig -- that is your

14   signature?

15   A.  Yes.

16   Q.  And was there a discussion in this

17   document you filed with Bar Counsel about

18   fees?

19   A.  I don't remember.

20   Q.  Well, would you please look at what is

21   page 2 which is page JH X2 in this

22   package.

23   A.  Yeah, I don't remember receiving that.

1   Q.   No?  You signed it?

2   A.   Yes, but I don't --

3   Q.   You signed that document?

4   A.   I don't remember that document.

5   Q.   So it is your signature?

6   A.   That is my signature, yeah.

7   Q.   Okay.  So as of -- and there is a list

8   of fees you were charged or to be charged

9   as part of your 2014 complaint?

10   A.   Okay.

11       MR. CARAKATSANE:  Well, Attorney

12   Wiest, is that a question?  Are you asking

13   was it attached when he signed?

14       MR. WIEST:  Yeah, I said does the

15   document say what the document says.

16       MR. CARAKATSANE:  Well, there's a

17   difference, sir.

18       Mr. Lamarche, when you signed the

19   document, was this page 2 attached?

20       THE WITNESS:  I don't remember, I

21   don't recall seeing this paper, no, sir.

22       MR. CARAKATSANE:  Did you draft

23   it?

1    THE WITNESS:  I did not draft

2 that.

3    MR. CARAKATSANE:  Okay, go ahead,

4 Mr. Wiest.

5 **Q.**  Well, Mr. Lamarche, if you did not

6 draft that, who did?

7 **A.**  James Hayes.

8 **Q.**  James drafted the bar complaint

9 against himself, is that what you're

10 testifying to?

11 **A.**  Yes, yes.

12 **Q.**  Well --

13 **A.**  I can't put two sentences together let

14 alone something like this.

15 **Q.**  Well, let's go --

16    (Overtalking.)

17 **A.**  Sorry about that.

18 **Q.**  Let's go back to the period in which

19 you signed, signed the letter withdrawing

20 this complaint.  Now, that began with --

21 if I may take a second.

22    (Document Perusal.)

23 **Q.**  That began with a series of emails

EXHIBIT C

```
 1                          I N D E X

 2

 3    WITNESS                                EXAMINATION

 4    RANDAL LAMARCHE

 5    By Mr. Wiest                                8

 6    By Ms. Lavigne                             25

 7    JAMES HAYES

 8    By Ms. Lavigne                             28

 9

10                       E X H I B I T S

11    NUMBER                                        PAGE

12    1-55          Marked previously

13    56            8/26/14 Request for Investigation     15

14    57            9/13/17 Statement of Randal Lamarche  16

15

16

17

18

19

20

21

22

23

24
```

24

1               P R O C E E D I N G S

2               MS. YU:  We are now live streaming.  Thank you.

3               MR. CARAKATSANE:  All right.  Let me announce

4       the case for the record, on record.  This is the case

5       of -- the second day of hearing in Bar Counsel versus

6       James Hayes.  And I'll have the -- well, when we have a

7       new witness, we'll identify the panel members.  Go

8       ahead.

9               We did have an off-record discussion regarding

10      whether bar counsel can speak in between -- after

11      cross-examination, have a breakout session with the

12      sitting witness, and there was a consent to that as long

13      as we reflect it on the record.  And now we have a

14      question from the respondent regarding consultation with

15      attorneys as well, and Mr. Woolf is going to respond to

16      that.

17              MR. WOOLF:  Let me show everybody.  Okay.  You

18      can see now the -- page three of the supplemental

19      prehearing order, unauthorized communications, that

20      basically says there's not -- subject to an order from

21      the hearing committee, there's no right to -- a witness

22      cannot confer with any counsel during the break of the

23      witness's testimony.  The reason is that, in the

24      brick-and-mortar world, the witness is on the stand.

25

```
 1        They'd be examined.  They'd be cross-examined, they'd be
 2        redirect, recross, and all this would take place
 3        contiguously.  The witness would not come off the stand,
 4        go talk to the lawyer, and then go back on the stand.
 5               So this essentially is to mirror the procedure
 6        in a normal adjudicative proceeding, which is why bar
 7        counsel had to ask permission to talk to Mr. Lamarche
 8        before redirect because -- and this is Mr. Hayes'
 9        point -- absent an order from the chair, no, you could
10        not talk to Mr. Wiest during a break in your testimony,
11        whether it's a recess or between direct and cross, or
12        cross and redirect.  So that's the short answer.  So
13        that's why bar counsel asked.
14               So the answer is absent a ruling from the
15        Chair, no, there's not a right to do this.  This has come
16        up in other cases.  Different hearing committees have
17        handled it differently.  But, absent a ruling, that's
18        what the prehearing order says.
19               MR. HAYES:  So then I would ask that the Chair
20        consider amending it so that the courtesy that is
21        extended to Ms. Lavigne would be extended to both sides
22        in the same manner.
23               MS. LAVIGNE:  May I be heard?
24               MR. CARAKATSANE:  Yeah.  Well, let me say that
```

26

1    we'll take it on a case-by-case basis as to whether

2    there's needs and so forth.  Obviously, as we mentioned,

3    your consultations with your own attorney, you're

4    entitled to.

5              MR. HAYES:  Even during a break in testimony?

6              MR. CARAKATSANE:  Yes, within bounds.

7    Typically, it has to do with whether there's privileged

8    information, but within bounds.  The bounds would be he

9    can't -- an attorney can give you legal advice, but can't

10   coach you on an answer.

11             MR. WOOLF:  I think bar counsel wanted to be

12   heard.

13             MR. CARAKATSANE:  Sure.

14             MS. LAVIGNE:  I was simply going to ask that

15   rather than -- what I think you've already done is rather

16   than making a blanket statement now, if there are

17   opportunities in which Mr. Hayes would like to speak to

18   his client, that he ask you at that time, just like I

19   asked you at this time, with the specific request

20   relating to redirect.

21             MR. CARAKATSANE:  Exactly.  Thank you.  So are

22   we ready at this point?  Because I'll have a series of

23   questions again for the witness.

24             Mr. Lamarche, I need to ask you the same

27

EXHIBIT D

1    Q.   Mr. Lamarche, when we were in our breakout session, I

2          asked you about the 2014 complaint you filed against

3          Mr. Hayes, right?

4    A.   Yes.

5    Q.   And you agree that you filed that complaint against

6          Mr. Hayes?

7    A.   Yes.

8    Q.   But you don't remember who drafted the attachment that

9          Mr. Wiest was showing you?

10   A.   Correct.

11            MS. LAVIGNE:  Okay.  That's it.

12            MR. CARAKATSANE:  Any further questioning,

13    Mr. Wiest?

14            MR. WIEST:  None on my part.  Thank you very

15    much.

16            MR. CARAKATSANE:  All right.  Mr. Lamarche, I

17    want to thank you very, very much.  You --

18            MR. WOOLF:  I'm sorry.  Mr. Chairman?  Do you

19    folks want to confer about any questions that the three

20    of you may have for Mr. Lamarche?

21            MR. CARAKATSANE:  I'm sorry, I -- you're

22    correct.  I don't have any, but I'm going to defer, give

23    an opportunity for Mr. Foster and Mr. Travayiakis to --

24    if they have any.

29