SUFFOLK, SS.

SUPREME JUDICIAL COURT
FOR THE COMMONWEALTH
FILE NO. SJC-13388

_____
                                )
In re:                          )
                                )
JAMES HAYES, ESQ.               )
                                )
_____ )

## PRELIMINARY MEMORANDUM OF JAMES HAYES

Respondent James Hayes ("Mr. Hayes") respectfully submits this preliminary memorandum pursuant to Rule 2.23 of the Supreme Judicial Court for the purpose of demonstrating that this Court must reverse, vacate or modify the Judgment entered on February 14, 2023 (Georges, J., as Single Justice) disbarring Mr. Hayes, or, in the alternative, direct Mr. Hayes' appeal of that Judgment proceed in the normal course. The imposition of disbarment was unsupported by substantial evidence, rested on numerous errors of law in the Hearing Committee report adopted by the Board of Bar Overseers (the "BBO"), and is likely to result in substantial injustice. This case thus merits either immediate relief or full panel review under Rule 2.23(c), or in the alternative, remand.

## BACKGROUND

These proceedings arose out of Mr. Hayes' representation of a single client, Randall LaMarche ("Mr. LaMarche") and, to a more limited extent, his half-brother Jason Prestia ("Mr. Prestia"), in what developed into a four-year, multi-faceted engagement after Mr. LaMarche received a $455,000 (after withholding of Federal and Commonwealth income taxes) lump sum check on or about August 26, 2013 representing the present value of a Massachusetts State Lottery

ticket providing for a first prize of $1,000,000 payable over a 20-year period. Proceedings during five days of trial before a Hearing Committee in June, 2021 showed little dispute over the chronology of events in issue. The Hearing Committee's interpretation of the evidence which could be gleaned from the 68 exhibits before the panel and findings on credibility which Mr. Hayes asserts are inconsistent with the documentary evidence (essentially adopted by the BBO and Justice Georges in his memorandum on single panel review (the "SJ Mem")) (PDF 1348) with respect to the initial stage of that engagement—Mr. Hayes' conduct while assisting Mr. Lamarche in child support proceedings--lie at the heart of Mr. Hayes' appeal.

A. Mr. LaMarche's Lottery Windfall, Its
   Disposition, and the Subsequent
   Child Support Proceeding

As recounted in Justice Georges' Memorandum of Decision, Mr. LaMarche "began spending some of his winnings, purchasing a 2013 Dodge pickup truck, a used Corvette, and a motorcycle" immediately after receiving his jackpot check. SJ Mem. at 3, PDF 1350. After learning of Mr. LaMarche's good fortune and spending spree through social media posts, Julie Kenney, the mother of three of Mr. LaMarche's children ("Ms. Kenney"), commenced proceedings in Middlesex Probate Court on August 29, 2013, seeking enforcement and modification of existing support orders under G.L. c. 209C, §§ 1, 9 against Mr. LaMarche dating to 2010, so as to obtain an increase in payments then set at $80/month (the lowest amount then permitted under applicable child support guidelines). (*Id.* at 3-4, PDF 1351-52). Upon the filing of Ms. Kenney's application, Hon. Spencer M. Kagan allowed *ex parte* temporary orders essentially restraining Mr. LaMarche from further disposing of lottery proceeds. *Id.* at 4, PDF

1352; Ex. 5, PDF 704)[1]) Probate Court docket sheets before the Hearing Committee reflect service of the *ex parte* order on September 3, 2013 (Ex. 55, PDF 1267, 1276 at item 36).

At some point in late August or early September 2013, Mr. LaMarche transferred up to half of his lottery winnings to Mr. Prestia. Mr. LaMarche's original probate counsel, Mary Beth Ayvazian ("Ms. Avayzian") later represented in pleadings before Probate Court that the transfer was made under an "arrangement" between Mr. LaMarche and Mr. Prestia to share their lottery winnings equally. (Ex. 20(Probate Court filing of September 30, 2013), PDF 750, 751). No evidence was ever presented before the Probate Court or the Hearing Committee in this case that the transfer was made before Mr. LaMarche had notice of or been served with the August 30 Order.

Mr. Hayes (who was admitted to the Bar in 1982 after practicing as an accountant, held the degree of Master of Taxation and concentrated his practice on business transaction, tax and immigration matters) (Tr.III-12-16, PDF 557-58)[2] first encountered Mr. LaMarche in early September, 2013, after what Mr. LaMarche testified was "maybe 2 to 3 weeks after I won the lottery," having "avoided it for a couple of weeks" (Tr. I-105-06, PDF 455) Ultimately, Mr. LaMarche engaged Mr. Hayes in connection with a real estate transaction in New Hampshire and to provide assistance to Mr. LaMarche on tax matters connected to his lottery windfall. [Tr. II, 20-23, PDF 559-60). Mr. Hayes testified he became generally aware of the child support proceeding shortly thereafter, reviewing Probate Court files in the case. *Id.*

---

[1]  References to the 68 hearing exhibits contained in the Information and Record Appendix (as filed) will be in the form "Ex.    , PDF       ".

[2]  In the first instance, references to the transcripts of the five days of hearings in this proceeding will be in the form "TR -   , (referring to the day of hearing as a Roman numeral and the page number of that day on which testimony was found), PDF    " (referring to the PDF number of the page of the Record Appendix on which that transcript page may be found in "4-in-1" reduced format in the Record Appendix as filed). Volume I of the proposed Supplemental Appendix (providing full-page transcripts for the convenience of the Court) is being filed and served pursuant to this Court's Order of June 22, 2023 electronically simultaneously with this document on June 23, 2023.

Mr. Hayes attended a hearing in Middlesex Probate Court on September 11, 2013, at which time Ms. Avayzian was appearing for Mr. LaMarche. (Tr III-23, PDF 560) The previous day, Ms. Avayzian had signed and filed a Rule 401 financial statement reporting that Mr. LaMarche retained in cash only $50,000 of the $455,000 net lottery payout and had assets of no more than $150,000 (Ex.6, PDF 705). At the conclusion of the hearing, Hon. Dorothy M. Gibson appointed Todd Beauregard, Esq., ("Mr. Beauregard") as receiver to collect such assets as could be traced to Mr. LaMarche's winnings to protect Ms. Kenney's ability to collect child support on the basis of the lottery payout. *See* SJ Mem. at 5, PDF 1352. A temporary order also increased child support to be paid to Ms. Kenney to $350.00 per week. *Id.* at 5-6, PDF 1352-53. The child support award was equivalent to 35% of the value of Mr. LaMarche's lottery prize of $50,000 per year (approximately $1,000 per week) for twenty years had he not opted for a lump sum payout. This award tracked the presumptive award of 35% for earned income equivalent to the periodic lottery payout under Child Support Guidelines then in force. Indeed, George Panas, Esq., counsel for Ms. Kenney ("Mr. Panas"), acknowledged in his testimony to the Hearing Committee that the temporary award was consistent with the 2013 Child Support Guidelines. (Tr. IV-27-29 , PDF 635.)

Following the September 11 hearing, Mr. LaMarche learned that Ms. Ayvazian (who by then was holding Mr. LaMarche's remaining funds in her client trust account) had drawn down $10,000 in fees for her services before tendering the balance of those funds (approximately $45,000) to Mr. Beauregard as receiver. At that point, Mr. LaMarche decided to discharge Ms. Avazian and asked Mr. Hayes to represent him in the child support matter. (Tr. III-24-26, PDF 560-61(Testimony of Mr. Hayes)).Mr. Hayes testified he was aware at that time Mr. LaMarche's history of manic depression, and was concerned that Mr. LaMarche would be a suicide risk were

he to be imprisoned for contempt for failure—given the near total absence of assets reflected in the Rule 401 statement—to comply with temporary orders effectively freezing his assets and directing him to turn over what remained to Mr. Beauregard. Tr. III 26-32, PDF 561-62.  Mr. Hayes' strategy for both managing his engagement with Mr. LaMarche and handling the Probate Court proceedings reflected these concerns.

On September 20, 2013 Mr. LaMarche executed a fee agreement for services rendered after September 1, 2013 that Mr. Hayes had drafted. SJ Mem. at 7-8, PDF 1354-55.  The agreement (Ex. 10, PDF 717) set forth a schedule of likely fees and promised oral consultation on matters regarding the engagement.  Nonetheless, its express language gave Mr. Hayes the exclusive power to determine the scope of his engagement and set his own fees, securing their payment by a power of attorney granted by Mr. LaMarche to Mr. Hayes.  The agreement by its terms provided "no paper trail" would be created, including invoices, effectively waiving compliance with provisions of Mass.R.Prof.C. 1.15 governing client trust accounts.  SJ Memorandum at 7, PDF 1354.  Mr. Hayes testified he drafted those terms to address his need to act quickly on behalf of a client he saw as a suicide risk facing imminent imprisonment, his understanding that Mr. LaMarche preferred to deal with matters over the telephone or face to face and (as the fee agreement provided) desired to avoid the creation of any documents which might identify assets available to Ms. Kenney or other creditors. Tr. II-33-47, PDF 497-501; Tr. III-43-47, PDF 565-66.  Notwithstanding these justifications, Justice Georges found the provisions of the fee agreement and the related power of attorney to be "oppressive, unfair, and unreasonable".  (SJ Mem. at 8-9, PDF 1355-56).[3]

Mr. Hayes' tactical choices in and around the child support proceeding were also geared to the immediate protection of Mr. LaMarche from imprisonment for contempt.  On October 9, 2013,

---

[3]  Mr. Hayes had entered into an engagement agreement with Mr. Prestia on similar terms.  *See* Tr. III-135, PDF 588.

one day before the next scheduled hearing in the child support proceeding, Mr. Hayes drafted and filed on Mr. LaMarche's behalf a petition for relief under Chapter 13 of the Bankruptcy Code, with the intended effect of staying any further contempt proceedings in the Probate Court under 11 U.S.C. §362 (SJ Mem. at 9, PDF 1356). Believing that his representation of Mr. LaMarche in the Bankruptcy Court barred formal participation in the pending child support proceedings Tr. II-78, PDF 509, Mr. Hayes also drafted for Mr. LaMarche's *pro se* filing a petition for single justice Appeals Court review under G.L. c. 211, §118 of the temporary orders freezing his jackpot-related assets and directing they be placed in the hands of a receiver. *See* SJ Mem. at 11, PDF 1358. Mr. Hayes never formally appeared in the Probate Court or the Appeals Court for Mr. LaMarche, asserting at hearings on, *e.g.*, October 11, 2013, that he was speaking in that Court only as Mr. LaMarche's "proxy" in view of Mr. LaMarche's psychiatric issues. SJ Mem. at 9-10, PDF 1356-57. The record showed that this behavior was tolerated by Justice Gibson and both Mr. Beauregard (as receiver) and Mr. Panas, (as counsel for Ms. Kenney) understood that Mr. Hayes was speaking (and writng) for Mr. LaMarche. *See* Tr. IV 33-34, PDF 636-37 (Testimony of Mr. Panas). Mr. Hayes' "proxy" appearances continued until January 15, 2014 when Hon. William McSweeney, a different Probate Justice, insisted counsel enter a formal appearance. Tr. III 60-63, PDF 569-70.

During the third quarter of 2013, Mr. Hayes continued to work on what was originally expected to be Mr. LaMarche's acquisition of property in New Hampshire via a trust employing lottery proceeds; indeed, it was Mr. Hayes's testimony "that the original plan was to put a house into the trust." Tr. III-169, PDF 597. Consistent with this plan, on September 10, 2013, Mr. Hayes recorded an instrument in Hillsborough County, New Hampshire, creating a trust (Great Summertime Trust) for that purpose; it was ultimately determined that Mr. Hayes was to be its Trustee and the sole named beneficiary on creation would be Mr. Prestia. (SJ Mem. at 5, PDF

1352). The Trust was not funded until September 16, when Mr. Prestia transferred $170,000 to

Mr. Hayes as his attorney (Ex. 9, PDF 517). The funds were deposited into Mr. Hayes' IOLTA

account where, it is undisputed, the funds remained until disbursed (ultimately, instead of a house

purchase, for Mr. Hayes' fees and for other purposes).

After Mr. Hayes arranged for the engagement of Stephen Lentine, Esq. to formally appear

for Mr. LaMarche, the child support proceeding was settled as of January 29, 2014, with the

establishment of a trust to be funded by the money transferred to Mr. Beauregard by Ms. Ayvazian

as receiver[4] and the transfer of $50,000 Mr. Hayes was holding in an IOLTA account received

from Mr. Prestia, albeit attributable to Mr. LaMarche's lottery payment. (Ex. 32, PDF 835). At

the $350/week rate ordered by the Probate Court, the trust, with in excess of $90,000 in capital,

was sufficiently funded to pay support due Mr. LaMarche's and Ms. Kenney's children for at least

five years. This concluded the child support proceedings less than five months after her complaint

for modification had been filed.

B. The Balance of Services Rendered by
   Mr. Hayes to Mr. LaMarche

During and after child support proceedings, Mr. Hayes provided a wide range of services

to Mr. LaMarche and his brother. *See* SJ Mem. at 12-13, PDF 1359-60. Outside the child support

proceeding, Mr. Hayes' principal focus was on providing legal and tax accounting representation

to Mr. LaMarche and Mr. Prestia seeking to reduce Federal and Commonwealth taxes payable on

the lottery prize in which they both claimed an interest and providing general business and tax

---

[4] While the funds held by Mr. Beauregard were initially part of Mr. LaMarche's Chapter 13 bankruptcy estate, Mr. Hayes (who remained counsel of record in the bankruptcy) and Mr. Beauregard entered into a stipulation in November, 2013 lifting the bankruptcy stay to permit Mr. Beauregard to satisfy child support obligations at the rate of $350/week as set in temporary orders. Exs. 25-26, PDF 788-95. The bankruptcy was dismissed in its entirety after the child support proceeding was settled. Exs. 34-35, PDF 840-844.

representation. This culminated in Mr. Hayes' filing in 2014 income tax returns on behalf of Mr. LaMarche for 2013 which led to the refund of $50,776 in previously withheld Federal income taxes and approximately $14000 withheld by the Commonwealth from Mr. LaMarche's lump sum prize.[5] In 2015, after exhaustive bookkeeping and accounting work, Mr. Hayes determined that Mr. LaMarche had incurred additional gambling losses attributable to 2014 and so-called "net operating losses" in taxi and vehicle leasing business and the operation of a used goods store in 2014. Mr. Hayes—as permitted by IRC §172, 17 U.S.C. §172—later quantified the losses which permitted the filing of an amended 2013 Form 1040X for Mr. LaMarche in 2015. Tr. II-115-17, PDF 518. On the basis of the filing, Mr. LaMarche received a refund of an additional $16,098 in Federal taxes. (Ex. 60, PDF 1304) Mr. LaMarche, who had entered into a separate agreement with Mr. Hayes for the payment of a 33% contingency fee on any refund resulting from the 2013 amended Form 1040X tax return (Tr. II-10-12, PDF 492; Ex. 42, PDF 888, 925-26) reneged on that agreement by tendering a check to Mr. Hayes that bounced (Tr. II-12, PDF 492)

Mr. Hayes also provided advice to Mr. LaMarche on a number of other matters, *see generally* Ex. 46, PDF 975 and Tr. II- 107-27, PDF 516-21 (testimony of Mr. Hayes concerning activities listed on Ex. 46). These included the organization of Mystical Motors Leasing Trust as a vehicle to lease one of the trucks Mr. LaMarche had acquired. At the request of Messrs. Prestia and LaMarche, Mr. Hayes completed as Trustee a sale of the vehicle for $29,500 in 2014, free of Massachusetts sales tax after Mr. Hayes had spent considerable time researching a potential lemon law claim (G.L c. 90, § 7N1/2) against the vehicle's seller. *See* Tr. II-123-24, PDF 520 and Ex.

---

[5] The Federal refund was received by Mr. Hayes as attorney, and immediately redisbursed to Mr. LaMarche, as reflected on a Bar Counsel analysis of Mr. Hayes' IOLTA account in evidence as Ex. 52, PDF 1131, 1133; Mr. LaMarche was paid the Massachusetts Form 1 refund for 2013 directly (Tr. II-118-19, PDF 584). Mr. LaMarche, on Mr. Hayes' advice, had declared the entirety of the lump sum payment of $455,000 to be his income on his 2013 Forms 1040 and Massachusetts Form 1, as permitted by, *inter alia,* I.R.C. §1(e) , 26 U.S.C. §1(e). *See* Tr. II-113-15, PDF 517-18,

36, PDF 845 (bill of sale). Before being discharged by Mr. LaMarche, Mr. Hayes also devoted considerable time, *e.g.,* to preparing claims arising out of the disclosure through social media of unauthorized information on Mr. LaMarche's psychiatric condition, restoring Mr. LaMarche's SSI benefits and access to his children under District Court protective orders. Even while denouncing Mr. Hayes' billing practices as a whole, Justice Georges agreed that Mr. Hayes "did do a modicum of legal work" for which some compensation was justifiable. SJ Mem. at 19, PDF 1366.

Ultimately, Mr. Hayes received (and deposited to his IOLTA account) $214,000 from assets attributable to Mr. LaMarche's lump sum lottery payments ($4500 as an initial retainer on real estate matters, $170,000 from Mr. Prestia in connection with the funding of Great Summertime Trust, and $29,500 from the sale of the vehicle titled to Mystical Motors). SJ Mem. at 11, PDF 1358. Bar Counsel's analysis of Mr. Hayes' IOLTA accounts, with which Justice Georges agreed (SJ Mem at 12, PDF 1359), showed that he disbursed only $85,000 of that amount to what he attributed to fees and disbursements due from Messrs. LaMarche and Prestia under the terms of fee agreements. The balance (approximately $130,000) was eventually paid out to Mr. LaMarche, Mr. Prestia, or their designees (including the $50,000 nominally paid from funds attributed to Mr. Prestia used to resolve the child support dispute).

C. Mr. LaMarche's 2014 and 2017
   Requests For Investigation

The investigation of Mr. Hayes' conduct by Bar Counsel which led to these proceedings began in September 2014, when Mr. LaMarche submitted a Request for Investigation given file number C2-14-0140 (Ex 56, PDF 1291), to which was attached a printed "Statement of Facts" setting forth a schedule of specific fees for specific services—and specific disbursement to Mr. LaMarche. The statement made clear Mr. LaMarche's 2014 charges of misconduct were based in part on "excessive fees" and "[l]ack of communication". In any event, Mr. LaMarche essentially

withdrew the complaint (using a document that Mr. Hayes drafted) after Mr. Hayes issued a fee refund of $1,750, and, as noted at SJ Mem. 14, PDF 1361[6], Bar Counsel closed the investigation in January, 2015, and Mr. LaMarche continued to employ Mr. Hayes' services thereafter, particularly in securing additional 2013 tax refunds in 2015.

Mr. LaMarche filed a second Request for Investigation in September, 2017, again attaching a statement of "facts" complaining of excessive fees, poor communication, and how funds received from Mr. LaMarche and Mr. Prestia (who Mr. LaMarche stated "won" the lottery jackpot with him) were accounted for. (Ex. 57, PDF 1294). Investigation on that file went forward (File No. C2-17-00249745), culminating in these proceedings.

## THE HISTORY OF THESE PROCEEDINGS

Formal disciplinary proceedings against Mr. Hayes began on June 30, 2020, when Bar Counsel was authorized by the Board of Bar Overseers (*see* SJC Rule 4:01 §§ 8(1)(c), (3); BBO Rule § 2.7(3)) to file a petition for discipline (PDF 10). Mr. Hayes filed an answer on August 10, 2020 (PDF 37). Hearings were conducted on June 3 (transcript at PDF 429), 4 (PDF 489), 7 (PDF 555), 8 (PDF 628) and 9 (PDF 652), 2021. The Hearing Committee issued its report recommending disbarment on December 28, 2021 (PDF 258), which was affirmed on appeal to the Board of Bar Overseers (two members concurring only in the recommendation for disbarment) on June 13, 2022, when the BBO filed its report (PDF 394) and voted to authorize the filing of the Information seeking Mr. Hayes' disbarment.

The Information was filed in the Supreme Judicial Court for Suffolk County on August 24, 2022 and was assigned to Hon Serge Georges, Jr. as Single Justice. After oral argument December 2, 2022, Justice Georges issued his Memorandum of Decision on February 14, 2023, directing

---

[6] Justice Georges treated the refund which led to the withdrawal of the 2014 Request for Investigation as a violation of Mass.R.Prof.C. 8.4. SJ Mem. at 17, PDF 1364. This was plain error of law. *See* pp. 16-17 *infra*.

entry of the Judgment of Disbarment the same day.  Mr. Hayes' counsel timely filed a notice of

appeal pursuant to Rule 2.23 on February 17, 2023, and this case was opened as an appeal to the

Supreme Judicial Court for the Commonwealth as case no. SJC-13388 on February 21, 2023.[7]

## **ARGUMENT**

The first paragraph of Rule 2.23(b) states that this Court may either modify bar discipline

entered by the single justice or set the case for full panel review if the preliminary memorandum

demonstrates:

> an error of law or abuse of discretion by the single justice; that the decision is not
> supported by substantial evidence .  .  .  or that for other reasons the decision will
> result in a substantial injustice.

The process leading up to disbarment was sufficiently flawed so as to require reversal, vacatur, or

modification under Rule 2.23, an order directing review after full briefing by this Court, or, in the

alternative, remand of the case for further proceedings (including additional evidentiary hearings)

before the Board of Bar Overseers.

## I.
## **THE RECORD DID NOT CONTAIN THE SUBSTANTIAL EVIDENCE REQUIRED TO SUPPORT A JUDGMENT OF DISBARMENT**

SJC Rule 4.01, §8(6) mandates that the BBO's recommendations on discipline may be

upheld only if "supported by substantial evidence." The recommendation for disbarment was

colored by findings that Mr. Hayes was the creator of a scheme by which Mr. LaMarche, sought

to "fraudulently" evade the application of $455,000 of lottery winnings to pre-existing child

support obligations by transferring 50% of the payment to a half-brother, Jason Prestia.  The only

---

[7]  No payment of the entry fee was made (nor affidavit of indigency submitted) prior to the expiration of the ordinary 10 day period for payment on March 3, 2023.  As more fully set forth in Mr. Hayes' motion for leave to file this memorandum late (filed May 22, 2023 as Docket Item 4), after recovering from a period of depression at the time the entry fee was due, Mr. Hayes tendered payment of the entry fee on May 5, 2023 (Docket Item 3 in this Court).  The motion was allowed on May 23, 2022, directing this memorandum be filed no later than June 13, 2013.

affirmative evidence Mr. Hayes was part of such a plot was a single line of Mr. LaMarche's testimony before the Hearing Committee that the transfer was made "because James [Mr. Hayes] said I should." (Tr. I-48, PDF 440)   The Hearing Committee, the BBO, and Justice Georges all asserted that Mr. LaMarche's testimony provided a framework to damn Mr. Hayes under BBO Rule 5.53, (hearing committee findings on the credibility of witnesses are controlling in later stages of BBO proceedings).  In doing so, they ignored testimony and substantial documentary evidence which contradicted Mr. LaMarche's implied chronology of events and Mr. Hayes' role as a facilitator of Mr. LaMarche's efforts to hide assets in pending child support cases.

It is settled that "credibility determinations [in bar discipline cases] may be rejected [if] it can be said with certainty that the finding was wholly inconsistent with another implicit finding." *Matter of Haese*, 468 Mass. 1002, 1007, 9 N.E.3d 326, 333(2014).  The record which was available to both the BBO and Bar Counsel mandates such rejection.  Mr. LaMarche's 2017 complaint to Bar Counsel expressly stated "Jason Prestia (brother) and I won 1 million dollars on a scratch ticket."  (Ex. 57, PDF 1295).  Mr. LaMarche also testified on questioning by the Hearing Committee that he did not begin to consult Mr. Hayes until "two or three weeks" after winning the lottery, *see* p. 3, *supra.*  Evidence of record shows that the transfer to Mr. Prestia was disclosed by Mr. LaMarche's prior counsel, Mary Beth Ayvazian, Esq., who represented that "*Mr. Prestia* is now in possession of approximately half of the lottery winnings as per the arrangement between the brothers" in a September 30, 2013 probate court filing in connection with her withdrawal as Mr. LaMarche's counsel.(Ex. 20, ¶4, PDF 751, emphasis supplied)[8]   The only affirmative

---

[8]   The September 30 disclosure was entirely consistent with a Probate Court Rule 401 financial statement Ms. Ayvazian filed on September 10, 2013 (which both she and Mr. LaMarche had signed under pains and penalties of perjury) reporting Mr. LaMarche's cash assets were approximately $51,543 and total assets only $106,543, two weeks after Mr. LaMarche had received a $455,000 Lottery check (Ex. 6, PDF 705)—and well within the period in which Mr. LaMarche testified that he was delaying a first encounter with Mr. Hayes, *see* p. 3, *supra.*

evidence of the transfer showed that Mr. Prestia was in possession of funds attributable to Mr. LaMarche's lottery winnings until Mr. Prestia transferred $170,000 for deposit to Mr Hayes' IOLTA account on September 16, 2013.(Ex. 52 (Bar Counsel analysis of IOLTA account) at line 7, PDF 1131)).  Mr. Hayes testified at that time "the original plan was to put a house into the trust" Tr. III-169, PDF 597.[9]  A bank statement showing Mr. Prestia had in excess of $200,000 on deposit as of September 8, 2013 (presumably representing lottery proceeds transferred by Mr. LaMarche to Mr. Prestia) in the account from which he made the $170,000 payment to Mr. Hayes was before the hearing committee as an attachment to hearing Exhibit 38 (October 14, 2014 letter from Mr. Hayes to Bar Counsel, PDF 856, 867)[10]  The variance between the documentary evidence in the record and Mr. LaMarche's offhanded attribution of Mr. Hayes as a co-conspirator belies the existence of "substantial evidence" of fraud undermines the balance of the findings underlying the draconian remedy of disbarment, and suggests further review of this case should go forward.

The reliance on Mr. LaMarche's credibility on this single point is even more strained by the manner in which his other testimony was viewed.    Justice Georges found no substantial

---

[9]  This testimony makes the (uncited) reference in SJ Mem at 5, PDF 1352, to a snatch of a November 14, 2017 letter to Bar Counsel (Ex. 42, PDF 891) referring to "asset protection" in connection with Great Summertime Trust to be at worst out of context and at best inapposite.  The decision to make Mr. Hayes the permanent Trustee and thus the custodian of its assets (as contemplated, only property Mr. LaMarche had under contract, *see* p. 6, *supra*), rather than a "Mr. McMattam" (as transcribed), was made only on September 16.  *See* Tr.  II-117-18, PDF 525-26 (Testimony of Mr. Hayes).

[10]   Bar Counsel also produced at its recorded interview of Mr. Hayes on October 18, 2018 (before the Hearing Committee as Exhibit 44, PDF 987 ff.) an affidavit of Mr. Prestia asserting that lottery proceeds were divided between Mr LaMarche and Mr. Prestia pursuant to a "pooling" arrangement.  Mr. Hayes' moved to add this affidavit (marked as Exhibit 13 to the recorded interview) to a Supplmental Record Appendix, which would include the affidavit and other documents supporting the contention that the transfer in issue was unconnected to Mr. Hayes.  This Court's Order of June 22, 2023 directed the filing of the proposed supplemental record appendix, which is being filed electronically simultaneously with this document.  The documents in question may be found at pages 33-40 of that document.

It is curious that in the Information filed on behalf of the Board of Bar Overseers for Single Justice review, page 7 of Exhibit 42 before the Hearing Committee (Suffolk County Docket Item 3, Item 18 at PDF page 971), which identified many of the documents discussed in this footnote, appeared only as a blacked out page.  The copy of Exhibit 42 (as originally presented to the Hearing Committee) in the Record Appendix (beginning at PDF 888) is complete.

evidence on the basis of Mr. LaMarche's testimony to support Bar Counsel's contention "that LaMarche, at Hayes's instruction, signed his name on blank paper" allegedly later used as receipts for funds and information. SJ Mem. at 13n.5, PDF 1360. The BBO's memorandum on review of the Hearing Committee (PDF 394) stated, notwithstanding Mr. LaMarche's express testimony (Tr. I-40, PDF 438), that it was "inconceivable" that Mr. LaMarche did not discuss existing Probate Court orders with Mr. Hayes. *Id.* at 18, PDF 412.

The extent to which the panel—claiming discretion to find only that element of Mr. LaMarche's testimony credible which painted Mr. Hayes as a fraudster—chose to ignore the record as a whole was further demonstrated as to its treatment of testimony concerning Mr. LaMarche's 2014 request that Bar Counsel investigate Mr. Hayes' conduct. While Justice Georges credited Mr. LaMarche's testimony that "Hayes did not provide LaMarche with an itemization of his services", SJ Mem. at 12, PDF 1350, the 2014 Request for Investigation (Ex. 57, PDF 1294) had an attachment setting forth, *inter alia*, a list of specific fees for specific services. (*Id.* at PDF 1225) When first asked who drafted the attachment, Mr. LaMarche testified that he believed *Mr. Hayes* was the author of the documents making allegations against *Mr. Hayes* (Tr. I-143-44, PDF 464). Only after consultation with Bar Counsel of which the Hearing Committee was aware and expressly permitted (PDF II-24-26, PDF 495-96) even though it was prohibited by a prehearing order[11] did Mr. LaMarche trim back his testimony on redirect to state he did not remember who drafted the complaint against Mr. Hayes (Tr. II-25-26, PDF 495-96). This disclaimer of what was patently unbelievable testimony places the credibility of all testimony of Mr. LaMarche into question. There was no basis to accept the credibility of only one snatch of Mr. LaMarche's

---

[11] A prohibition against "talking with a witness during any break in the witness's testimony" was set forth in paragraph 9 of the Supplemental Pretrial Order addressing the fact that hearings were to be conducted "remotely" entered as Docket Item 17 before the BBO on December 18, 2020. A copy of the Order is at page 43 of Volume II of the proposed supplemental record appendix being filed simultaneously with this memorandum, *see* p.13, n. 10, *supra.*

testimony that contradicted the documentary record and, indeed, Mr LaMarche's own testimony as to his first contact with Mr. Hayes, when his testimony was incredible on so many other points. Without that testimony, there was no direct evidence of "fraud". The absence of such evidence mandates full panel action.

## II.
## THE JUDGMENT OF DISBARMENT RESTS ON SUBSTANTIAL ERRORS OF LAW

The rush of the Hearing Committee, and subsequently the BBO and the Single Justice on review, to view every element of Mr. Hayes' representation as an act in furtherance of Mr. LaMarche's efforts to avoid child support obligations went beyond its exploitation of a single line of Mr. LaMarche's testimony. The misconstruction of individual acts as proof of fraud was, in fact, based on errors of law concerning the filing of a bankruptcy petition and a petition for G.L. 231, §118 single justice review intended to protect Mr. LaMarche from the imposition of summary contempt remedies during child support proceedings, Mr. Hayes' right to collect fees for the filing for Mr. LaMarche of an amended 2013 tax return on the basis of 2014 net operating losses and the painting of all of the fees paid to Mr. Hayes as "theft" without making any effort to determine what represented fair value for the services Mr. Hayes provided Mr. LaMarche. Mr. Hayes is entitled to full panel review of all these errors which contributed to the entry of a judgment for disbarment.

*1. The Bankruptcy Proceeding.* Mr. Hayes filed a bankruptcy petition on October 9, 2013 on Mr. LaMarche's behalf for the purpose of obtaining an automatic stay of proceedings under 11 U.S.C. §362 that could lead to contempt imprisonment. Justice Georges, affirming findings of the Hearing Committee and the BBO, asserted "Hayes filed [the] bankruptcy petition in bad faith," even when no such finding had been sought or entered in the Bankruptcy Court. SJ Mem. at 14, PDF 1352. Massachusetts courts have recognized that the institution of bankruptcy proceedings to stay enforcement proceedings is an ordinary and appropriate means of protecting property

subject to Probate Court orders. See *Amonte* v. *Amonte*, 17 Mass. App. Ct. 621, 461 N.E.2d 826 (1984). Even if the Supremacy Clause, U.S. Const. art. i, §12, permitted state bar discipline for conduct which was never sanctioned by a Federal bankruptcy court, disbarment for conduct expressly contemplated by Massachusetts law rests on an error of law which must be reviewed.

*2. The Single Justice Petition*. Mr. Hayes also drafted a petition for single justice relief (G.L. c.231, §118) to be filed nominally *pro se* by Mr. LaMarche challenging Probate Court orders restraining Mr. LaMarche's use of lottery proceeds and directing their turnover to a receiver on pain of contempt penalties. The petition (Ex. 21, PDF 754) argued the temporary orders were improper, inasmuch as child support should be based upon a parent's actual earning capacity rather than immediate current income (even a windfall lottery win), *citing, e.g.*, *Bassette* v. *Bartolucci*, 38 Mass.App.Ct. 732, 652 N.E.2d. 623 (1995). It also argued that the Probate Court lacked the power in proceedings under G.L. c. 209C comparable to the express authority to effect divisions of marital property under G.L. c. 208, §34 in divorce cases. While the BBO asserted the petition was an element of Mr. Hayes' fraudulent scheme, BBO Memorandum at 9-10, PDF 401-02. Justice Georges limited his finding to an observation that "[the] petition was denied within one week of its filing." SJ Mem. at 11, PDF 1349. Mass. R. Prof. C. 3.4(c) expressly permits non-compliance with "obligations under the rules of a tribunal"—i.e., the temporary orders challenged under G.L. c. 231, §118-- where there has been "an assertion that no valid obligation exists." The transmutation into fraud of Mr. Hayes' law-based zealous advocacy to protect Mr. LaMarche from novel temporary orders must be reviewed for error of law.

*3. Fees for the Filing of An Amended Tax Return*. As set forth at p. 8, *supra,* Mr Hayes and Mr. LaMarche entered into an agreement in 2015 under which Mr. LaMarche would pay a contingent fee for the filing of an amended 2013 Federal income tax return on Form 1040X in

which net operating losses accrued in 2014 would be used to reduce 2013 income, thus leading to a refund of taxes originally paid for 2013. Mr. LaMarche ultimately received a refund of over $16,000, but refused to pay the 33% contingent fee due Mr. Hayes. Justice Georges' opinion asserted that charging a fee on a "straightforward tax refund" that could not be claimed until a subsequent year's tax return had been filed somehow constituted double billing.[12] SJ Mem. at 12, PDF 1350. The assertion that no fees could be charged for the amendment of a prior year tax return to assert refund claims based on subsequent year losses (not errors in the content of the return as filed) as discovered through Mr. Hayes' efforts in 2015, *see* p. 8, *supra,* turns the concept of *quantum meruit* on its head and constitutes plain error of law justifying further review.

4. *The Failure to Quantify Mr. Hayes' Allegedly Excess Fees*: Justice Georges' opinion recognized that Mr. Hayes "did do a modicum of legal work" for which some compensation was justifiable. S.J. Mem. at 19, PDF 1357. Nonetheless, he concluded that Mr. Hayes' billing practices and IOLTA management violations supported a finding that Mr. Hayes had intentionally deprived Mr. LaMarche of property so as to justify severe discipline under *Matter of Schoepfer*, 426 Mass. 183, 187, 687 N.E. 2d 391 (1997). *Id.* at 18-19, PDF 1356-57. However, there was never any quantification of what portion of Mr. Hayes' retained fees were unearned. There was never the detailed evidentiary analysis of what the quantum of a "reasonable" fee to Mr. LaMarche seemingly required by, *e.g.*, Mass.R.Prof.C. 1.5(a) and followed in cases such as *Matter of*

---

[12]   There was never any dispute that Mr. LaMarche had been charged $5000 in legal and accounting fees by Mr. Hayes for preparation of 2014 tax returns (which reflected net operating losses from gambling, a second-hand store, and vehicle leasing) before filing of the amended 2013 return.

*Fordham*, 423 Mass. 481, 668 N.E. 2d 816 (1996).[13]  To the extent the amount of "theft" justifying

discipline under *Schoepfer* was never quantified, it was plain error of law justifying further review.

**III.**
**GIVEN THE LACK OF SUBSTANTIAL EVIDENCE AND THE NUMEROUS ERRORS
OF LAW REFLECTED IN THE SINGLE JUSTICE OPINION, IMPOSITION OF
DISBARMENT WILL RESULT IN A SUBSTANTIAL INJUSTICE**

Rule 2.23 states that full panel review is appropriate if "the decision [in issue] will result

in a substantial injustice."  The recommendation for disbarment in this case flows directly from a

characterization of Mr. Hayes' conduct as "fraud" in the absence of substantial evidence and on

the basis of errors of law consistent with such a mischaracterization.  Even if the terms of Mr.

Hayes' fee agreement with Mr. LaMarche, and his noncompliance with IOLTA recordkeeping and

disclosure requirements set forth in Mass.R.Prof..C. 1.15 may justify *some* discipline, sanctions

imposed for such misconduct ordinarily do not reach the level of disbarment.  If the findings of

fraud in this case cannot survive full panel review, the imposition of disbarment as a sanction will

result in "substantial injustice" for which full panel review should also be invoked.

All respondents in bar discipline matters are entitled to an individual assessment of their

misconduct.  *Matter of Balliro*, 453 Mass. 75, 85, 899 N.E.2d 794, 802(2009).  The case that was

actually brought to Bar Counsel—a complaint over the quantum of fees Mr. LaMarche asserted he

had paid for specific services—ordinarily would not end with disbarment.  Even the BBO's report

recommending disbarment acknowledged that the default sanction imposed in excessive fee cases

under Rule 1.5 since *Fordham, supra,* has been a public reprimand in the absence of other proven

---

[13]  For example, while Mr. Hayes' receipt of a $7000 fixed fee for assisting Mr. LaMarche in pressing claims for the unauthorized disclosure of his medical records by an employee of Harvard Vanguard Medical Associates was harped upon as one to which he was "not entitled", SJ Mem. at 12, PDF 1350, in fact Mr. Hayes prepared and submitted a demand letter to HVMA and a formal complaint to the Federal Department of Health and Human Services after conducting substantial research, believing that such action was a predicate to asserting damages claims.  Copies of correspondence relating to the administrative claims are set forth at pages 82-113 of the second volume of the proposed supplemental appendix being filed today, *see* p. 13, n, 10, *supra.*

violations. BBO Memorandum at 23, PDF 416; *see generally, e.g., Matter of Raferty*, 26 Mass. Att'y Disc. R. 538, 541 (2010). The BBO Memorandum also acknowledged that the presumptive sanction for the other acts of misconduct the Hearing Committee attributed to Mr. Hayes, including what use of an exploitative fee agreement, IOLTA recordkeeping and disclosure violations, and "proxy" representation and undisclosed *pro se* ghostwriting in violation of the limited representation rules, would be far less than disbarment. *See* BBO Memorandum at 26-29. PDF 419-22. To impose a greater penalty if the contentions of fraud are unsustainable would constitute the substantial injustice Rule 2.23(b) was intended to forestall.

If comparable discipline is to be applied in comparable cases, *see, e.g., Matter of Finn*, 433 Mass. 418, 742 N.E.2d 1075 (2001), *Matter of Doyle*, 429 Mass. 1013, 710 N.E.2d 955 (1999), disbarment goes far beyond the remedies actually imposed even in view of the rule that multiple violations may justify enhanced sanctions, *Matter of Grayer,* 483 Mass. 1013,1018-1019 (2019); *Matter of McBride,* 21 Mass. Att'y Disc. R. 455, 469-70(2005)(Sosman, J.), *aff'd* 449 Mass. 154 (2007). The creation of false billing records leading to over $200,000 in overcharges in *Matter of Zankowski,* 487 Mass. 140, 164 N.E.3d 898 (2021) (2-year suspension), and the six-figure fee created by fraudulent overbilling in *Matter of Goldstone,* 445 Mass. 551, 839 N.E.2d 825 (2013) far outweigh any overcharge that a proper *Fordham* analysis might have revealed in this case where net fees, less disbursements, were in the area of $75,000 for services rendered over a period of four years.[14] *Cf. Matter of an Attorney* (Admonition No. 13-18), 29 Mass. Att'y Disc. R. 727, 744 (2013) (attorney whose $130,000 fee far exceeded the $60-65,000 fee deemed to be reasonable only admonished on evidence that "the respondent [had] committed herself to providing the client

---

[14] Mr. Hayes' accounting of the net fees that he retained was set forth in attachments to correspondence with Bar Counsel dated June 28, 2018, which were before the Hearing Committee as Exhibit 44 (PDF 958) and a second schedule of disbursements (Exhibit 58A, PDF 1301) discussed at the hearing. (Tr. III-93-99, PDF 578-579).

with attentive, competent legal services and to make sure the client's needs were met" and had not acted in bad faith).[15] Similarly, discipline for violations of IOLTA accounting and disclosure rules is often limited to public reprimand in cases without actual deprivation, no matter how it occurred. *See, e.g., Matter of Cabana*, 29 Mass. Att'y Disc. R. 77, 79 (2013)(stipulated public reprimand on conditions). The only concrete harm found in this matter was "deprivation" of funds entrusted to an IOLTA account attributable to excessive fees, which were never quantified. Disbarment on the rationale of *Matter of Schoepfer, supra*, would be a substantial injustice which should be the subject of full panel review under Rule 2.23(b).

## CONCLUSION

Mr. Hayes respectfully submits the record does not provide substantial evidence that he acted *in pari delicto* with Mr. LaMarche in his efforts to avoid application of his lottery windfall to existing child support obligations, which led to errors of law and a recommendation to impose an excessive sanction of disbarment. Accordingly, this Court should exercise its discretion under Rule 2.23 to conduct a full panel review in this case, reverse, vacate or modify the Judgment entered on February 14, 2023 (Georges, J.) disbarring Mr. Hayes or remand this case for further proceedings (including evidentiary proceedings) before the Board of Bar Overseers.

Dated  June 23, 2023

> JAMES HAYES,
> By his attorney,
> /s/Edward R. Wiest
> Edward R. Wiest (BBO 547801)
> Edward R. Wiest, P.C.
> 81 Dana Street
> Cambridge, MA 02138
> (617) 547-6500
> erwiest@wiestlaw.com

---

[15] A chalk comparing Mr. Hayes' services and fees to Mr. LaMarche and the services in issue in *Matter of an Attorney* (Admonition No. 13-18) were annexed to a set of proposed findings submitted to the Hearing Committee and included in the Information at PDF 257.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of this document by causing it to be delivered to all parties (specifically Heather L. LaVigne, Assistant Bar Counsel) through the Supreme Judicial Court E-File system.

/s/Edward R. Wiest
Edward R. Wiest (BBO 547801)
Edward R. Wiest, P.C.
81 Dana Street
Cambridge, MA 02138
(617) 547-6500
erwiest@wiestlaw.com

Dated:  June 23, 2023